UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| PAMLAB, L.L.C., and BRECKENRIDGE PHARMACEUTICAL, INC., Plaintiffs, v. MACOVEN PHARMACEUTICALS, L.L.C., Defendant. | CIVIL ACTION NO. 2:13- ________ SECTION ___ MAGISTRATE DIVISION ___ **JURY DEMANDED** |

**COMPLAINT**

Plaintiffs Pamlab, L.L.C., and Breckenridge Pharmaceutical, Inc., by and through their attorneys, state as follows for their Complaint against Defendant Macoven Pharmaceuticals, L.L.C.:

**The Parties**

1. Plaintiff Pamlab, L.L.C. ("Pamlab") is a limited liability company existing under the laws of the State of Louisiana, with its principal place of business at 4099 Highway 190, Covington, Louisiana, 70433.

2. Plaintiff Breckenridge Pharmaceutical, Inc. ("Breckenridge") is a corporation existing under the laws of the State of Florida, with its principal place of business at 1141 South Rogers Circle, Suite 3, Boca Raton, Florida, 33487.

3. Defendant Macoven Pharmaceuticals, L.L.C. ("Macoven") is a Louisiana limited liability company with its principal place of business at 33219 Forest West Drive, Magnolia, Texas, 77354.

## Jurisdiction And Venue

4. This Court has original jurisdiction over the subject matter of this lawsuit under 28 U.S.C. § 1331 and 15 U.S.C. § 1221(a), because it concerns violations of section 43 of the Lanham Act, 15 U.S.C. § 1125; this Court has supplemental jurisdiction over the state law claims herein pursuant to 28 U.S.C. § 1367, because the subject matter is so related to the claims asserted under federal law as to form part of the same case or controversy.

5. Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391 because Macoven is a Louisiana entity. Macoven is also subject to personal jurisdiction for this same reason, and because it markets and sells products to nationwide retail drug store chains, including those with locations within this judicial district, as well as through nationwide distributors and databases that target this judicial district.

## STATEMENT OF FACTS

### Plaintiff Pamlab And Its Medical Foods

6. Plaintiff Pamlab is a fully integrated pharmaceutical company, founded over 50 years ago, that is now the largest pharmaceutical company in Louisiana. Pamlab specializes in the development of prescription medical foods that are marketed and sold nationally.

7. Pamlab markets its medical foods as a "brand" pharmaceutical company. As such, Pamlab markets its products directly to physicians, educating physicians concerning the benefits and appropriate uses of its medical food products. Pamlab has spent millions of dollars calling on tens of thousands of physicians through Pamlab's sales force, providing millions of product samples, publishing articles and advertisements in medical journals, and funding clinical studies.

8. "Medical foods" are to be used by patients under the supervision of a physician or other licensed health professional. Pamlab's medical foods at issue here have been formulated to provide the biologically active form of "folate," needed to meet the distinct nutritional requirements of patients with certain diseases and medical conditions that have been demonstrated to respond to such formulation, and are available by prescription only.

9. Among these products marketed by Pamlab are the five that are relevant to this lawsuit: (1) Metanx®, (2) Cerefolin-NAC®, (3) Neevo® DHA, (4) Deplin® 7.5, and (5) Deplin® 15.

10. Previously, folate supplementation was usually provided via a synthetic form of folic acid (for example, in daily vitamins and dietary supplements). Such synthetic forms of folic acid must undergo several metabolic steps to be converted into their biologically active forms of folate before they can be used in the human body.

11. However, due to their unique formulation, Metanx®, Cerefolin-NAC®, Neevo® DHA, Deplin® 7.5, and Deplin® 15 (collectively, the "Pamlab Products") contain the active form of folate used by the body: 6(S)-5-Methyltetrahydrofolate, also called L-Methylfolate. The presence of the dietary ingredient L-Methylfolate is used by Pamlab as a unique selling point for these products.

12. The unique benefits of this compound come in part from the fact that L-Methylfolate consists of a single diastereoisomer. Many chemical compounds occur as mixtures of two or more diastereoisomers, which have the same chemical composition, but differ in the spatial arrangement of the atoms. The various diastereoisomers that are present in such mixtures may have very different properties from one another. In some cases, one diastereoisomer can have a therapeutic effect, while another diastereoisomer is therapeutically

ineffective or even harmful. Thus, there are often great benefits to providing patients and consumers with a product that contains only a single diastereoisomer as opposed to a diastereoisomeric mixture.

13. Diastereoisomers are distinguished from one another through naming conventions that reflect their different properties. One such naming convention uses an "L" in the name of the compound to indicate one diastereoisomer, and a "D" in the name of the compound for a different diastereoisomer. The L-form of this compound used in the Pamlab Products – *i.e.*, L-Methylfolate – is superior to the D-form of this compound (D-Methylfolate) because the L-form is the predominant form of folate found in food and the human body. The L-form is the biologically active form of folate and has proven to have a high degree of bioavailability (the rate at which a drug or other substance is available at the targeted place in the body) in humans. The D-form, on the other hand, is of no benefit to humans.

14. In sum, Pamlab's various brand Products are formulated for health care professionals to provide folate, an essential human vitamin of the B complex, in its biologically active form, in amounts shown to be required to meet the distinct nutritional requirements of patients with specific diseases or conditions that have been demonstrated to benefit from such treatment.

**The Nature Of Generic Competition For The Pamlab Products**
**<u>And The Role Of The Pharmaceutical Industry Databases</u>**

15. As is well known, pharmaceutical products are often available as a brand product and also as one or more "generic" versions that are required to contain the same active ingredients, dosage form, and strength as the brand product. The market for any particular pharmaceutical product typically begins with one established brand product, which is joined later by one or more lower-cost, generic alternatives.

16. Because the Pamlab Products are dispensed by prescription, in order for a generic product to compete in this market, it must be "substitutable" for one of the Pamlab Products. For this type of pharmaceutical product, a generic may be substituted for a brand product (where permitted) if it is "pharmaceutically equivalent," which means that it must contain the same active ingredients, in the same strengths, and in the same dosage form, as the brand product.

17. Before such substitution can occur, and thus before generic products can be marketed to pharmacies, it is necessary that the generic products be "linked" to the brand product in the industry databases such as First DataBank and Walters Kluwer (Medi-Span). Retail pharmacies, chains, and other purchasers of such products rely on this "linking" in the databases to establish that two different products are, in fact, pharmaceutically equivalent. Based on this "linking," pharmacists at the local level will decide what generic product can be substituted when filling a prescription, and pharmacy purchasers at the national level will decide what generic products to stock for their retail chain nationwide.

18. Unlike drugs, whose equivalency ratings are determined by the FDA and referenced in the FDA publication, the "Orange Book," equivalency determinations for medical foods are based on the honor system, whereby the databases rely primarily on information from the generic pharmaceutical companies themselves concerning the active ingredients. Generic medical foods are "linked" by the databases to branded products if the generic company represents that it has the same active ingredients—notwithstanding the actual contents of the products. The listing databases do *not* perform any independent testing on products to confirm the generic company's description of their ingredients. As such, this system depends on truthful reporting by the generic companies of the identity and amount of the active ingredients in their products. There is <u>no</u> "Orange Book" for medical foods.

**Plaintiff Breckenridge And The Authorized Generic Products**

19. Plaintiff Breckenridge, in contrast to Pamlab, is a generic pharmaceutical company. For more than 25 years Breckenridge has been in the business of developing and marketing generic pharmaceutical products, and currently markets many such products, all by having them "linked" in the industry databases to the brand products for which they may be substituted.

20. Following the introduction of unauthorized generic competition to the Pamlab Products in 2010, Pamlab first arranged for identical versions of some of the Pamlab Products, manufactured by its same manufacturing subsidiary, to be marketed as "authorized generics" under the Zerxis Pharmaceuticals label. Pursuant to an agreement between Pamlab and Breckenridge, all generic versions that have been authorized by Pamlab (the "Authorized Generic Products") are now marketed by Breckenridge. The Authorized Generic Products are all manufactured by Pamlab's manufacturing subsidiary, and so are identical in every way to the Pamlab Products, except for imprint and labeling. Pamlab and Breckenridge both share in the profits generated by sales of the Authorized Generic Products.

**Plaintiffs' Other Legal Proceedings Against Macoven**

21. Defendant Macoven also markets generic pharmaceutical products. In late 2011, Defendant Macoven began marketing a folic acid product which it represented to be pharmaceutically equivalent to, and substitutable for, two of Plaintiffs' folic acid products, namely Pamlab's Foltx® and Breckenridge Folbic®. Plaintiffs filed a lawsuit against Macoven alleging both Lanham Act violations and patent infringement (along with the pertinent patentee, Metabolite Laboratories, Inc.) in the United States District Court for the Southern District of New York, Civil Action No. 1:11-cv-09022-TPG.

22. Plaintiffs learned early in that litigation that Macoven's manufacturer, Viva Pharmaceutical, Inc. ("Viva"), had assigned an expiration date to Macoven's folic acid product without first performing the industry standard testing to support such a date, and had also not otherwise performed standard release testing, facts of which Macoven either was or should have been aware. (Plaintiffs thereafter filed a lawsuit against Viva in the United States District Court for the Western District of Washington, on January 17, 2012, Case No. 2:12-cv-00098-MJP, alleging both Lanham Act violations and patent infringement.)

23. It is a matter of public record in the prior lawsuit against Macoven that the above-referenced product testing, expected and required by industry standards before the assignment of an expiration date and before the release of a product, was not performed on Macoven's folic acid product by Viva until much later – in fact, that this standard testing was not performed until after the lack of it was pointed out by the plaintiffs in Court filings.

24. These prior lawsuits against Macoven and Viva concerning their folic acid product have now both been settled and dismissed, and Macoven's folic acid product has been withdrawn from the market.

25. Meanwhile, on January 19, 2012, Pamlab was one of three plaintiffs that filed a patent infringement lawsuit filed against Macoven United States District Court for the Eastern District of Texas concerning products containing L-Methylfolate (not folic acid), captioned *Merck & Cie, et al. v. Macoven, et al.*, Civil Action No. 6:12-cv-00027-LED. This lawsuit alleges the infringement of six patents owned by or licensed to Merck & Cie ("Merck") and plaintiff South Alabama Medical Science Foundation, and sublicensed exclusively to Pamlab for a certain field of use that includes medical foods. (These three parties are referred to collectively as the "L-Methyl Patent Plaintiffs.") Also named as defendants in this lawsuit are three

corporate entities named "Gnosis" which, upon information and belief, supply the L-Methylfolate ingredient to Macoven's manufacturer. The Macoven products identified as infringing, all of which are labeled by Macoven as containing L-Methylfolate, are: VitaCirc-B, Alz-NAC, L-Methylfolate PNV DHA, L-Methylfolate Calcium 7.5, and L-Methylfolate Calcium 15.

26. On September 10, 2012, the L-Methyl Patent Plaintiffs filed with the United States International Trade Commission (the "ITC") a request that the ITC commence an investigation under section 337 of the Tariff Act of 1930. The respondents in this investigation are also the defendants in the Texas lawsuit, and the investigation involves four of the same patents that are asserted in the Texas lawsuit. The ITC investigation has been assigned No. 337-TA-2912.

27. Based on the unopposed motion of the defendants in the Texas lawsuit, that action has now been stayed pending the outcome of the ITC investigation, pursuant to 28 U.S.C. § 1659. This statute provides that, on a timely request, where an action involves "parties that are also parties to a proceeding before the United States International Trade Commission under section 337," the district court "shall stay, until the determination of the Commission becomes final, proceedings in the civil action with respect to any claim that involves the same issues involved in the proceeding before the Commission."

28. However, without regard to whether or not Macoven is committing any acts of patent infringement related to the Macoven Products, Pamlab and Breckenridge have been and are being injured by Macoven's continued marketing of these products with false and/or misleading representations, as set forth below. Because the proceedings before the ITC do not involve any claims under the Lanham Act or under any state law pertaining to unfair competition

or deceptive marketing, and also because Breckenridge is not a party to the ITC Investigation, the Counts alleged below should be adjudicated the same as any other civil claims properly before this Court.

**Macoven's Continuing False And Misleading Misrepresentations Concerning The Macoven Products**

29. Macoven has marketed, and continues to market, its VitaCirc-B, Alz-NAC, L-Methylfolate PNV DHA, L-Methylfolate Calcium 7.5, and L-Methylfolate Calcium 15 (the "Macoven Products") as pharmaceutically equivalent to, and substitutable for, Metanx®, Cerefolin-NAC®, Neevo® DHA, Deplin® 7.5, and Deplin® 15 (the "Pamlab Products").

30. Breckenridge now markets Authorized Generic Products that are identical in every way to each of the Pamlab Products. Thus, to the extent there is generic substitution in filling a prescription for any one of the Pamlab Products, Breckenridge and Macoven are in direct competition.

31. Macoven has been representing and continues to represent to prospective purchasers of the Macoven Products, who are also customers of Pamlab and Breckenridge, that these products in fact contain the same active ingredients as, and can be substituted for, the Pamlab Products, and can be purchased in lieu of the Authorized Generic Products for such substitution. In the pharmaceutical industry, such representations are understood to mean that Macoven's manufacturer has supplied Macoven with appropriate and acceptable testing data to support such statements.

32. Macoven is well aware of this industry standard and understanding, and also well aware of the regulations governing the manufacture of such products, including the current Good Manufacturing Practices ("cGMPs") incorporated into federal regulations, that form the regulatory context that lead purchasers in the United States pharmaceutical industry to believe

that Macoven's representations of the active ingredients in the Macoven Products were supported by adequate testing. However, upon information and belief, Macoven continues to make misrepresentations concerning the active ingredients in the Macoven Products, based on inadequate, incomplete, untimely and improper testing.

33. Macoven's representations concerning the Macoven Products are also false and/or misleading because at least some of those products contain large amounts of D-Methylfolate.

34. In addition, Macoven has affixed two-year expiration dates to the Macoven Products, which was necessary to enable these products to compete with Plaintiffs' products, and which represents to the mutual customers of Plaintiffs and Macoven that industry-standard testing had been performed to support these expiration periods. However, upon information and belief, Macoven is aware that its manufacturer continues to assign expiration dates to these products in contravention of industry standards, so that Macoven's representation to the industry that each of the Macoven Products has a two-year expiration period is an additional false and/or misleading statement.

35. Upon information and belief, Macoven has made other additional false and/or misleading descriptions and representations of fact, in commerce, that misrepresent the nature, characteristics, and/or qualities of the Macoven Products.

**COUNT I**
**VIOLATION OF THE LANHAM ACT**

36. Plaintiffs incorporate the allegations of the preceding paragraphs as though fully set forth herein.

37. Upon information and belief, the explicit and/or implicit representations by Macoven described above, including that adequate testing had been conducted on the Macoven Products to confirm that they contain the same active ingredients in the same amounts as, and/or

that they are substitutable for, the respective Pamlab Products, and other explicit and/or implicit representations made by Macoven, constitute false and/or misleading descriptions and representations of fact, in commerce, that misrepresent the nature, characteristics, and/or qualities of the Macoven Products, in violation of section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a).

38. In addition, upon information and belief, the marketing of the Macoven Products with two-year expiration dates stamped on their package labels also constitutes false and/or misleading descriptions and representations of fact, in commerce, that misrepresent the nature, characteristics, and/or qualities of the Macoven Products, in violation of section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a).

39. Plaintiffs have been injured thereby, in an amount to be determined at trial.

40. Upon information and belief, Macoven will continue its violations of the Lanham Act unless such violations thereof are restrained and enjoined by this Court. Should Macoven be permitted to continue its false and misleading descriptions and representations of fact and false advertising, Plaintiffs will suffer irreparable injury for which they have no adequate remedy at law.

**COUNT II**
**VIOLATION OF LOUISIANA UNFAIR TRADE PRACTICES AND CONSUMER PROTECTION LAW**

41. Plaintiffs incorporate the allegations of the preceding paragraphs as though fully set forth herein.

42. Macoven's conduct described above, including its implicit and/or explicit false and/or misleading statements concerning the Macoven Products, violates Section 51:1405(A) of the Louisiana Unfair Trade Practices and Consumer Protection Law

(UTPCPL) which declares unlawful "unfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce."

43. As a result of Macoven's violations of the UTPCPL, Plaintiffs have suffered and, unless such acts and practices are enjoined by this Court will continue to suffer, irreparable injury and damage to their business, reputation and goodwill for which they are entitled to relief. In addition, Plaintiffs are entitled to damages and attorneys' fees for Macoven's UTPCPL violations.

**WHEREFORE,** Plaintiffs request that the Court:

(a) Preliminarily and permanently enjoin Macoven, its officers, directors, employees, partners, agents, licensees, servants, successors and assigns, and any and all persons acting in privity or concert with them, from representing, explicitly or implicitly, that any of the Macoven Products is a pharmaceutical or generic equivalent to, or substitutable for, any of the Pamlab Products, and from making any other false, misleading and/or deceptive statements and representations concerning the Macoven Products, as determined at trial;

(b) Enter judgment against Macoven for compensatory damages by reason of its violations of the Lanham Act, in relation to the Macoven Products, in an amount to be determined at trial;

(c) Enter judgment against Macoven for compensatory damages by reason of its violations of the UTPCPL, in relation to the Macoven Products, in an amount to be determined at trial;

(d) Enter judgment against Macoven requiring it to pay Plaintiffs' reasonable attorneys' fees pursuant to 15 U.S.C. §1117(a);

(e) Enter judgment against Macoven requiring it to pay Plaintiffs' reasonable attorneys' fees pursuant to La. R.S. § 51:1409; and

(f) Enter an Order granting Plaintiffs such other and additional relief against Macoven as may be just and proper in the circumstances.

**DEMAND FOR TRIAL BY JURY**

Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, Plaintiffs demand a trial by jury of all issues properly triable to a jury in this case.

Dated: January 28, 2013

*s/ Robert S. Rooth*

**Robert S. Rooth, T.A.**
Louisiana Bar No. 11454
**Kurt D. Duncan**
Louisiana Bar No. 29842
**Loretta O. Hoskins**
Louisiana Bar No. 30558
**CHAFFE McCALL, L.L.P.**
2300 Energy Centre
1100 Poydras Street
New Orleans, LA 70163-2300
Telephone: (504) 585-7000
Telecopier: (504) 544-6088
Email: rooth@chaffe.com
Email: duncan@chaffe.com
Email: hoskins@chaffe.com

Of Counsel:
C. Randolph Ross
BRECKENRIDGE PHARMACEUTICAL, INC.
60 East 42nd Street Suite 5210
New York, NY 10165
Telephone: (646) 448-1303
Telecopier: (856) 494-1647
Email: rross@bpirx.com

Attorneys for Plaintiffs Pamlab, L.L.C., and Breckenridge Pharmaceutical, Inc.